## L.B. FOSTER COMPANY, Appellant

### v.

## SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 1997.

Decided Dec. 31, 1997.

Reargument Denied Feb. 19, 1998.

---

Joan A. Yue, Philadelphia, for appellant.

Joseph J. Devanney, Philadelphia, for appellee.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, FRIEDMAN and FLAHERTY, JJ.

FLAHERTY, Judge.

L.B. Foster Company (Foster) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) denying Foster's request for a preliminary injunction to prohibit Southeastern Pennsylvania Transportation Authority (SEPTA) from awarding a contract to a competitive bidder, Progress Rail Services (Progress), on the grounds that Progress' bid did not comply with the Pennsylvania "Buy American Act," [1] (the State Act) because a majority of the steel contained in its bid was produced in a foreign country, even though those steel products were available from American producers. We vacate and remand.

On January 30, 1996, SEPTA advertised for bids on a contract for public works to supply girder rail switches, crossings and accessories, designated as Sealed Bid Number 03056 (the bid request). The bid request called for bidders to furnish all special trackwork, i.e., rails, castings, and accessories, including, switches with switch machines, manual switches and switch heaters, to provide a complete layout for installation at two sites in Philadelphia. This public works project was assisted with Federal Transit Administration funds.

SEPTA sent a bid package out to all prospective bidders. The bid package included, *inter alia*, Instructions to Bidders, contract specifications, contract compliance requirements and a "Steel Products Certificate" and a "Buy America Certificate." The Steel Products Certificate was included pursuant to the State Act. The State Act provides that public agencies which seek bids for contracts on public works require that the bidders certify that the steel products used on such public works be steel made in the United States as defined in the State Act. 73 P.S.

---

**1.** The Pennsylvania Steel Products Procurement Act, Act of March 3, 1978, P.L. 6, 73 P.S. §§ 1881–1887, is also known colloquially as "the Buy American Act."

§§ 1884 and 1886. The State Act essentially requires that to qualify as domestic steel products, the product must contain at least 75% domestic steel. 73 P.S. § 1886 (the definition of "steel products").

The Buy America Certificate was included pursuant to the Federal Transit Administration Buy America Requirements as set forth in the Surface Transportation Assistance Act of 1982, as amended, 49 U.S.C. § 5323(j) (the Federal Act) and in the regulations set forth in 49 C.F.R. Pt. 661. The Federal Act essentially requires that 100% of the steel, iron and manufactured goods in a project supported by Federal Transit Authority funds be produced in the United States. 49 U.S.C. § 5323(j)(1). The Buy America Certificate requires that bidders certify that either they can comply with the Federal Act's requirements or that they are seeking a waiver from those requirements. Article 11 of SEPTA's Instructions to Bidders informed prospective bidders that the bid package submitted by the prospective bidder to SEPTA must include (1) a signed bid proposal form, (2) a signed Steel Products Certificate, and (3) a signed Buy America Certificate. Thus, the bidders had to certify that they met both the requirements of the State Act and the Federal Act or that they sought a waiver from the requirements of the Federal Act.

A total of five bidders responded to SEPTA. The bid opening was October 1, 1996. SEPTA determined that the lowest bidder was non-responsive to the contract specifications. The next lowest bidder was Progress Rail. Foster was the next lowest bidder. None of the bidders were able to execute the Buy America Certificate. Thus, all the bidders sought a waiver of the Federal Act's requirements.

The record indicates that Foster's bid included roughly 95% by cost domestic steel in its proposal. The other 5% by cost was foreign steel comprising girder rails specified by SEPTA in its bid request. These particular girder rails were not produced domestically and therefore could only be obtained from foreign sources. In contrast, Progress Rail's bid, in addition to the foreign-sourced girder rail, also indicated that Progress Rail proposed to procure the castings required by the SEPTA contract—which represents the largest of the contract components in terms of cost—from a foreign source. Foster avers that no more than 20% of the steel by cost proposed to be used by Progress Rail in its contract is domestically produced.

On or about November 1, 1996, SEPTA announced its intention to award the contract to Progress Rail. On November 7, 1996, Foster wrote to SEPTA, protesting the award of the contract to Progress Rail, asserting *inter alia*, that Progress Rail's bid did not comply with the State Act. After an exchange of letters between Foster and SEPTA proved fruitless, Foster filed for a preliminary injunction in the trial court.

█ In order for a court to properly grant a preliminary injunction, it must analyze the following factors: (1) that relief is necessary to prevent immediate and irreparable harm which cannot be compensated by damages; (2) that greater injury will occur from refusing the injunction than from granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear. *Lewis v. City of Harrisburg,* 158 Pa.Cmwlth. 318, 631 A.2d 807 (1993). In denying Foster's request for a preliminary injunction, the trial court below concluded "[o]ne of the requirements for injunctive relief is that the petitioner's right to ultimate relief must be clear, and here petitioner's right is at best dubious." (Trial Court slip op. at 5.) Thus, the trial court concluded that Foster's interpretation of the State Act as prohibiting the contract from being awarded to a bidder whose bid contains steel products from a foreign source where those steel products are available domestically is dubious.

█ Only if it is plain that no grounds exist to support the decree of the lower court *or* that the rule of law relied upon was palpably erroneous or misapplied, will an appellate court interfere with the decision of the Chancellor. *Lewis,* 631 A.2d at 810, *quoting, Roberts v. Board of Directors of School District of Scranton,* 462 Pa. 464, 469, 341 A.2d 475,

478 (1975)(emphasis added). We are aware of our Supreme Court's guidance that an appellate court does not inquire into the merits of the controversy upon review of a trial court's disposition of a preliminary injunction motion. Nevertheless, given that the lower court decided this motion upon the question of whether Foster's right to relief was clear, the threshold question is whether the trial court's conclusion that the State Act would not clearly provide a right to relief, presents a question of law for this court, as the trial court's disposition hinges upon an interpretation of the State Act. *See Lewis,* 631 A.2d at 810, *citing, Riverside School Board v. Kobeski,* 341 A.2d 475, 478 (Pa.Cmwlth.1992) ("Because one of the elements which the moving party must establish is that 'his right to relief is clear,' it is necessary that the moving party be able to show that he has a reasonable likelihood of success on the merits. It is thus entirely proper for a court to consider testimony going to the merits to this extent....") *See also Philadelphia Suburban Corp. v. Board of Finance and Revenue,* 535 Pa. 298, 302, 635 A.2d 116, 117 (1993)(meaning of a statute is a question of law). As the question of the likelihood of Foster's success on the merits presented herein necessarily implicates the question of the probable meaning of the State Act, we are thus faced with the second part of the appellate review of *Lewis,* namely, whether the rule of law relied upon was palpably erroneous.

█ On appeal to this Court, Foster argues that it was entitled to the award of the bid under the State Act and that the trial court erred in denying its request for a preliminary injunction. Foster maintains that SEPTA's award of the contract to Progress Rail violated the State Act because the majority of the steel included in its bid came from foreign sources.

The State Act provides that every public agency shall require that contracts for the maintenance of public works contain a provision that only steel products as defined in the State Act shall be used in the performance of the contract. See Section 4 of the State Act,

73 P.S. § 1884. Section 4 of the State Act does not apply, however, where the head of the public agency determines in writing that the steel products as defined in the State Act are not produced in the United States in sufficient quantities to meet the requirements of the contract.[2] *See* Section 4(b) of the State Act, 73 P.S. § 1884(b). The State Act defines "steel products" as:

> Products rolled, formed, shaped, drawn, extruded, forged, cast, fabricated or otherwise similarly processed, or processed by a combination of two or more of such operations, from steel made in the United States by the open hearth, basic oxygen, electric furnace, Bessemer or other steel making process and shall include cast iron products and shall include machinery and equipment listed in United States Department of Commerce Standard Industrial Classification 25 (furniture and fixture), 35 (machinery, except electrical) and 37 (transportation equipment) and made of, fabricated from, or containing steel components. If a product contains both foreign and United States steel, such product shall be determined to be a United States steel product only if at least 75% of the cost of the articles, materials and supplies have been mined, produced or manufactured, as the case may be, in the United States. Transportation equipment shall be determined to be a United States steel product if it complies with [49 U.S.C. § 5323(j) ].

Section 6 of the State Act, 73 P.S. § 1886 (footnote omitted).

Foster asserts that the only products excluded from the domestic steel products requirements of the State Act are products not produced and available in the United States in sufficient quantities to meet the contract's requirements. With regard to the instant contract, Foster maintains that the only steel requirements that are not produced in the United States and are, therefore, properly excepted from the State Act, are girder rails, which comprise 5% of the contract requirements. The remaining 95% of the contract's steel requirements, Foster notes, are pro-

---

**2.** There is no indication of record that the head of SEPTA has determined in writing that the steel products to be used or supplied in the performance of the contract are not produced in the United States in sufficient quantities to meet the requirements of the contract.

duced and available in the United States and under the terms of the contract, *had* to be an American-made product. Foster maintains that Progress Rail's bid should be disqualified as non-responsive to SEPTA's request for bids because Progress Rail's bid did not comply with the State Act requiring at least 75% domestic steel.

In response, SEPTA argues that because the procurement contract at issue involves "transportation equipment," the articles to be supplied are excepted from the definition of steel products found in the State Act and are instead evaluated under the Buy America criteria in the Federal Act. Thus, once it became apparent that none of the bidders could provide transportation equipment comprised of only American-made steel, the American-made requirement was waived and SEPTA was free to choose the lowest bidder.

"Transportation Equipment" is mentioned on two occasions in Section 6 of the State Act. In the first instance, Section 6 states that steel products are those items which are "processed ... from steel made in the United States ... and shall include machinery and equipment listed in United States Department of Commerce Standard Industrial Classification ... 37 (transportation equipment) and made of, fabricated from, or containing steel components." In the second instance, Section 6 of the State Act states, "Transportation equipment shall be determined to be a United States steel product if it complies with [49 U.S.C. § 5323(j) ]," i.e., the Buy America provisions of the Federal Act.

Foster notes that Standard Industrial Classification 37 (SIC 37) discusses transportation equipment as being products that are typically "rolling stock" and components thereof, including cars and car equipment, locomotives, locomotive frames and parts, railway motor cars, etc. Because the trackwork and trackwork components sought in the present procurement contract are not included in SIC 37, Foster maintains that the articles sought are not, as SEPTA contends, transportation equipment. Consequently, under Foster's rationale, the lowest responsible bidder awarded the contract procurement must comply with the steel products provision of the State Act.

Conversely, SEPTA argues that the second reference to transportation equipment in Section 6 of the State Act governs what is considered to be transportation equipment under the circumstances. This portion of the State Act indicates that transportation equipment will be determined to be a United States steel product if it complies with the Buy America provision of the Federal Act. The Buy America provision states:

(j) Buy America.-(1) The Secretary of Transportation may obligate an amount that may be appropriated to carry out this chapter for a project only if the steel, iron, and manufactured goods used in the project are produced in the United States. (2) The Secretary of Transportation may waive paragraph (1) of this subsection if the Secretary finds that-

(A) applying paragraph (1) would be inconsistent with the public interest;

(B) the steel, iron, and goods produced in the United States are not produced in sufficient and reasonably available amount or are not of a satisfactory quality;

(C) when procuring rolling stock (including train control communication, and traction power equipment) under this chapter-

(i) the cost of components and subcomponents produced in the United States is more than 60 percent of the cost of all components of the rolling stock; and

(ii) final assembly of the rolling stock has occurred in the United States; or

(D) including domestic material will increase the cost of the overall project by more than 25 percent.

49 U.S.C. § 5323(j). Thus, pursuant to SEPTA's rationale, once foreign steel is present in a procurement contract for transportation equipment, a bidder cannot meet the 100% domestic requirement of the Buy America provision in the Federal Act and therefore, cannot meet the provisions of the State Act. Hence, SEPTA asserts that it is then under no compulsion to analyze the

domestic steel content in any of the submitted bids.[3]

The court below apparently accepted SEPTA's argument to the extent that once foreign steel was present in the contract, SEPTA was thereafter not required under the State Act to look at the feasibility of domestic production of every steel product proposed in the contract. The trial court determined that

> the state Act provides for a waiver of the American-made requirement if it is determined that there are not enough domestic steel products available to fulfill the requirements of the contract. The statute does not require any product-by-product analysis; instead, the [State] Act is clear that this determination is to be made by looking at the contract as a whole. Therefore, the American-made requirement was properly waived in the instant matter.

(Trial court slip op. at pp. 4–5). We cannot agree that this is the correct interpretation of the State Act.

First we find unpersuasive SEPTA's assertion that the term "transportation equipment" used in the statute's definition of "steel products" means two different things in the two different sentences in which it is used in the same Section 6. We find that the State Act clearly indicates that "transportation equipment" is to be defined with reference to SIC 37. Thus, we find that when the legislature used the phrase "transportation equipment" in the last sentence of the definition of steel products which is merely one sentence removed from the sentence indicating that transportation equipment is to be defined with reference to SIC 37, the legislature intended that these identical terms have the same meaning in both sentences. *See*

*Quaid v. Tax Review Board of Philadelphia,* 188 Pa. Superior Ct. 623, 149 A.2d 557 (1959) (words are to be construed according to their ordinary meaning unless the statute defines them otherwise). SEPTA argues that if the SIC 37 definition controls then the equipment called for in this bid request would not even fall under the provisions of the State Act. SEPTA argues that this is so because of the statutory construction rule of inclusio unius, exclusio alterius, i.e., where certain things are specifically designated in a statute, all omissions are to be understood as excluded. In other words, because the State Act specifically designates transportation equipment as only that equipment found in SIC 37, then any transportation equipment not found in SIC 37 is excluded from the operation of the State Act, i.e., does not have to meet the domestic steel requirements. This ignores the fact that the definition of "steel products" states that steel products are "[p]roducts rolled, formed, shaped, drawn, extruded, forged, cast, fabricated, or otherwise similarly processed ... *from steel made in the United States* ... and shall *include* machinery and equipment listed in the United States Department of Commerce" SIC 37. 73 P.S. § 1886 (emphasis added). The definition makes clear that any products rolled, formed or shaped, etc., from United States steel constitute steel products within the meaning of the State Act. Although the steel products required for this trackwork bid are not listed in SIC 37,[4] they are nevertheless, products rolled, formed, shaped, etc., from United States steel within the meaning of the State Act and, therefore, subject to the domestic steel composition requirements.

The applicable rule of statutory construction is not inclusio unius, exclusio alterius,

---

**3.** SEPTA also notes that even if Foster's bid did consist of 100% domestic steel, it would not be entitled to an award of the bid, because there was a 25% bid differential between Foster's bid and Progress Rail's bid. *See* Section 5323(j)(2)(D) of the Federal Act. SEPTA's Brief at 11. However, while Foster may not be entitled to an award of the bid merely *because* its bid contained more domestic steel than did Progress Rail's bid, Foster did not argue otherwise. Rather, as Foster notes, the Federal Act merely authorizes the Secretary of Transportation to waive the requirement that the project contain 100% American steel where to not do so would cause a 25%

cost increase. Thus, the Secretary of Transportation may, but need not, do so. 49 U.S.C. § 5323(j)(2)(D). Such unusual flexibility in pricing public bidding projects emphasizes the intent of Congress to underscore the importance of encouraging governmental transportation units to buy steel products produced in America whenever available.

**4.** SEPTA does not contend that the products required by its bid request fall within the list of transportation equipment found in SIC 37.

rather, the correct rule is noscitur a sociis—a word or phrase is known by its associates. In other words, transportation equipment listed in SIC 37 is subject to the State Act to the extent that it involves products rolled, formed, shaped, etc., from United States steel. Application of the rule inclusio unius, exclusio alterius would frustrate the intent of the legislature, whereas application of the rule noscitur a sociis would effectuate the intent of the legislature. SEPTA's argument in this regard and, more generally, the trial court's holding in this case, are contrary to the intent of the statute. 1 Pa.C.S. §§ 1901 and 1921(a) (the function of statutory construction is to ascertain and effectuate the intent of the General Assembly). The intent of the State Act is to at all times promote the use of United States steel products. *See* 73 P.S. §§ 1883 and 1887. If transportation equipment, as defined, is involved but is excluded under the provisions of the Federal Act, the remaining parts of the contract are not thereby excluded from compliance with the State Act. Section 6 of the State Act treats transportation equipment differently, as stated in the last sentence, but does not state that once any transportation equipment is involved, all the steel used is exempt from the requirement to use domestic products.[5]

Additionally, to adopt SEPTA's and the lower court's interpretation would mean that a prospective bidder would not know with certainty what was bid. The use of competitive bidding requires that all bidders begin on equal footing, that is, the bid proposal is intended to uniformly give the bidders the information they need to submit a bid. SEPTA's bid proposal only informed the bidders that they were bound by the State Act and the Federal Act, but did not inform them that it believed (erroneously) that "transportation equipment" was involved and that domestic steel was not required. The bidders had no way of knowing whether to attempt to use as much United States steel products as possible in compliance with the State Act or to use as much foreign steel as necessary to attain the lowest possible bid.

The same is true as to whether there is a 25% differential between Foster's bid and Progress Rail Services' bid. SEPTA should have set up the bid documents so that all parties' bids would be on the same footing. If it wanted to compare bids based on foreign and domestic products, it should have set up the bid that way. The way SEPTA miscrafted the bid, what the bidders had was a gamble. Those that chose to comply with the State Act were faced with the possibility that there would be a 25% differential in cost between their bid and those by bidders who chose to ignore the requirements of the statute. This is not how public bidding is intended to work. Although a bidder for a public contract always assumes some risks of the contract,[6] when the bid proposal states that the State Act must be complied with, a bidder should not be put at a disadvantage to a bidder who ignores that requirement.

As the trial court's interpretation of the State Act is legally erroneous, we must vacate its order denying the preliminary injunction and remand this case for further proceedings not inconsistent with this opinion. Although, we concluded that the trial court erred in its determination that Foster was unlikely to succeed on the merits, the trial court did not rule on the other prongs of the test for warranting a preliminary injunction. Accordingly, we remand for the trial court to rule on the other prongs of the test.

### ORDER

NOW, December 31, 1997, the order of the Court of Common Pleas of Philadelphia County, Docketed at No. 01164, December Term 1996, entered December 24, 1996 is hereby vacated. This case is remanded for the trial court to determine if L.B. Foster is entitled to a preliminary injunction.

Jurisdiction is relinquished.

---

5. SEPTA's interpretation of the State Act, regardless of whether it was in good faith, is erroneous and invalidates an award of the contract based on that interpretation. *Lutz Appellate Printers, Inc. v. Commonwealth*, 485 Pa. 559, 403 A.2d 530 (1979).

6. *See Hempt Brothers, Inc. v. Department of Transportation*, 36 Pa.Cmwlth. 516, 388 A.2d 761 (1978).