IN THE COMMONWEALTH COURT OF PENNSYLVANIA

United Blower, Inc. :
:
v. :
:
Lycoming County Water and : No. 1383 C.D. 2019
Sewer Authority : Argued: May 11, 2020
:
G.M. McCrossin, Inc. :
:
v. :
:
Lycoming County Water and :
Sewer Authority :
:
Appeal of: Lycoming County :
Water and Sewer Authority :


BEFORE:     HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CROMPTON                    FILED:  July 13, 2020


Before this Court is the appeal of the Lycoming County Water and Sewer Authority (Authority) from the order of the Lycoming County Court of Common Pleas (Trial Court) reversing the Authority's adjudication that G.M. McCrossin, Inc. (McCrossin) and United Blower, Inc. (UBI) were in violation of the Steel Products Procurement Act (Steel Act)[1] and requiring McCrossin and/or UBI to reimburse the Authority $243,505, the full cost of air blower systems and blowers provided to the Authority in connection with a project known as the Montoursville

[1] Act of March 3, 1978, P.L. 6, *as amended*, 73 P.S. §§1881-1887.

Regional Sewer System Waste Water Treatment Plan, Phase I Upgrade (Project).

Upon review, we affirm the Trial Court.

## I.    The Steel Act

Section 3 of the Steel Act states, in pertinent part:

> The Pennsylvania General Assembly . . . declares it to be the policy of the Commonwealth of Pennsylvania that all public officers and agencies should, at all times, aid and promote the development of the steel industry of the United States in order to stimulate and improve the economic well-being of the Commonwealth and its people.

73 P.S. §1883.

We note the following provisions of the Steel Act which are relevant to our determination herein.

> Section 4, relating to required contract provisions, provides:
>
> (a) Every public agency shall require that every contract document for the construction, reconstruction, alteration, repair, improvement or maintenance of public works contain a provision that, if any steel products are to be used or supplied in the performance of the contract, only steel products as herein defined shall be used or supplied in the performance of the contract or any subcontracts thereunder.
>
> (b) This section shall not apply in any case:    (1) where the head of the public agency, in writing, determines that steel products as herein defined are not produced in the United States in sufficient quantities to meet the requirements of the contract; or (2) to items on a list of exempt machinery and equipment steel products, which have been identified by the Department of General Services as not produced in the United States in sufficient

2

quantities in the previous calendar year, and published on the department's publicly accessible Internet website, which contractors, subcontractors, suppliers, bidders, offerors and public agencies can rely upon in preparing bids and contracts. The list of exempt machinery and equipment steel products shall be updated annually on a date selected by the Department of General Services . . . .

73 P.S. §1884(a)-(b).

Section 5, relating to payments under contracts; action to recover unauthorized payments; prohibitions for violations; procedure, provides:

(a) No public agency shall authorize, provide for or make any payments to any person under any contract containing the provision required by section 4 unless, when unidentified steel products are supplied under a contract, such person has provided documentation including, but not limited to, invoices, bills of lading, and mill certification that the steel was melted and manufactured in the United States, which establish that such person has fully complied with such provision. If a steel product is identifiable from its face, such person must submit certification which satisfies the public agency that such person has fully complied with the provision required by section 4. Any such payments made to any person by any public agency which should not have been made as a result of this section shall be recoverable directly from the contractor, subcontractor, manufacturer or supplier who did not comply with section 4 by either such public agency or the Attorney General of Pennsylvania.

(b) In addition to the withholding of payments, any person who willfully violates any of the provisions of this act shall be prohibited from submitting any bids to any public agency for any contract for a period of five years from the date of the determination that a violation has occurred. In the event the person who violates the provisions of section 4(a) is a subcontractor, manufacturer or supplier, such person shall be prohibited from performing any work or supplying any materials to a public agency for a period of five years from the date of the determination that a violation has occurred.

3

73 P.S. §1885(a)-(b).

Section 6, relating to definitions, provides:

* * * *

"Steel Products." Products rolled, formed, shaped, drawn, extruded, forged, cast, fabricated or otherwise similarly processed, or processed by a combination of two or more of such operations, from steel made in the United States by the open hearth, basic oxygen, electric furnace, Bessemer or other steel making process and shall include cast iron products and shall include machinery and equipment listed in United States Department of Commerce Standard Industrial Classification 25 (furniture and fixture), 35 (machinery, except electrical) and 37 (transportation equipment) and made of, fabricated from, or containing steel components. **If a product contains both foreign and United States steel, such product shall be determined to be a United States steel product only if at least 75% of the cost of the articles, materials and supplies have been mined, produced or manufactured, as the case may be, in the United States** . . . .

* * * *

73 P.S. §1886 (emphasis added).

Section 7, relating to purpose of act; liberal construction, provides:

This act is intended as remedial legislation designed to promote the general welfare and stimulate the economy of the Commonwealth and its people and each and every provision hereof is intended to receive a liberal construction such as will best effectuate that purpose and no provision is intended to receive a strict or limited construction.

73 P.S. §1887.

4

## II.    Project Background

McCrossin is a contracting and construction management firm headquartered in Bellefonte, Pennsylvania. It was the general contractor for the Authority on the Project, and in July 2011, it entered into an agreement with the Authority to supply eight air blower systems. The purpose of these air blower systems is to move air from one area to another. Each system is large, mostly enclosed, and has few moving parts. The blower systems and blowers are powered by electricity.

In August 2011, McCrossin and the Authority agreed to a change order for McCrossin to supply and install three new digester blowers to replace existing blowers that otherwise would have remained at the Authority's facility. The purpose of this change order was to allow for ease of maintenance in the future by providing digestive blowers from a single manufacturer. After approval of the change order, UBI became a subcontractor on the Project. UBI is a Georgia-based company that provides engineering, fabrication, assembly, and testing services. Reproduced Record (R.R.) at 0190-0191; 0426. UBI's role was to supply the air blower systems required by the original specifications and for the replacement of the three digestive blowers as required by the change order.

UBI prepared a submittal for the blower systems which was, in turn, submitted by McCrossin to the Authority's Project engineer, Brinjac Engineering (Brinjac). As part of the submittal, McCrossin provided Brinjac/Authority with an

ST-3 form,[2] verifying that 75% of the cost of the blowers was attributable to articles, materials, and supplies mined, produced, or manufactured in the United States. We note here that some of the materials used in the Project contained markings indicating that they were from China. The total amount paid by McCrossin to UBI for the eight blower systems and the three blowers was $239,800. The amount paid by the Authority to McCrossin for same was $243,505.

### III. The Beginning of Litigation

There came a point in time[3] when individuals employed by the Authority began to question whether McCrossin and UBI provided products that complied with the Steel Act. Thus, the Authority held a hearing on the matter on September 23, 2014. Subsequent to the hearing, the Authority issued an adjudication in which it determined that, while McCrossin and UBI had not willfully violated the provisions of the Steel Act, they had failed to provide steel products as defined therein. The Authority further determined that the remedy for the Steel Act violation was for McCrossin and/or UBI to pay it the full amount of what the Authority had paid to McCrossin, *i.e.*, $243,505, for completion of the Project. R.R. at 0650-0657. McCrossin and UBI appealed the Authority's adjudication to the Trial Court. The Trial Court subsequently remanded the matter to the Authority to be heard by an

---

[2] This is a form developed by the Pennsylvania Department of General Services for use in public agency projects involving steel products as a means to ensure the requisite amount of United States steel is being utilized in the project.

[3] It is unclear exactly when the Authority began to believe that there was a potential violation of the Steel Act. However, the belief occurred sometime prior to the Authority making its final payment to McCrossin on April 30, 2013. Nonetheless, there is no dispute that the final payment for the Project was made to McCrossin by the Authority. There are e-mails in the record from as early as March 7, 2013, suggesting some inquiry into the issue of the amount of domestic steel used in the project. R.R. at 0857-0859.

6

independent hearing officer (Hearing Officer). The Trial Court directed the Hearing Officer to make findings of fact and conclusions of law for adoption by the Authority, which would nullify and supersede the Authority's previous findings of fact, conclusions of law, and adjudication. R.R. at 0872. The Authority adopted the Hearing Officer's findings and conclusions and issued its adjudication on December 6, 2017.

## IV.    Hearing Officer's Determinations/Authority's Adjudications

In his findings and conclusions, the Hearing Officer determined that the issues to be decided in the case were whether the products provided by UBI are steel products governed by the Steel Act, and if so, whether they were manufactured in the United States as required by the Steel Act. R.R. at 016-030 (Adjudication).

The Hearing Officer rejected McCrossin's and UBI's argument that the blower systems and blowers at issue are not steel products as defined in the Steel Act because they are electrical machinery. The Hearing Officer stated that he did not agree with McCrossin's and UBI's assertion that the term, "except electrical," in the definition of "steel products"[4] should be interpreted to mean that any machine driven by electricity, regardless of the amount of steel it contains, is excluded from the Steel Act. The Hearing Officer noted that the Steel Act was intended as remedial legislation to stimulate Pennsylvania's economy and to promote the general welfare of the Commonwealth and that it should be interpreted liberally to accomplish that purpose.[5]    The Hearing Officer stated that the three Standard Industrial

---

[4] 73 P.S. §1886.

[5] 73 P.S. §1887.

7

Classifications (SIC) in the Steel Act are simply the titles of the classifications that were in use at the time the law was drafted and that the primary purpose of an SIC is not to define products but to define industries. The Hearing Officer noted that the first such classifications were made in 1937 and were updated from time to time thereafter, until 1987. He added that "Machinery, except electrical" was the title of Classification 35 in 1977 but that the 1987 version used different nomenclature. The Hearing Officer opined that, currently, the most relevant SIC Code would be 3564, "Industrial and Commercial Fans and Blowers and Air Purification Equipment." Thus, the Hearing Officer determined that the incorporation of the name of the SIC at the time the Steel Act became law did not exclude the equipment at issue in the present matter from the definition of steel products in the Steel Act.

The Hearing Officer next addressed McCrossin's and UBI's contention that an exception in Section 4(b)(1) of the Steel Act[6] should apply. This Section states that the requirement of using steel products manufactured in the United States does not apply when the head of the public agency determines, in writing, "that steel products as herein defined are not produced in the United States in sufficient quantities to meet the requirement of the contract." The Hearing Officer noted that this argument was based upon the Authority's agreement to the change order, which allowed for the substitution of UBI blowers in place of Dresser Roots blowers.[7] The Hearing Officer determined that McCrossin requested the change order. Thus, the Authority's agreement to the change did not equate to a written determination that

---

[6] 73 P.S. §1884(b)(1).

[7] Dresser Roots blowers are another brand of blowers produced by a different manufacturer.

8

there were not enough such blowers manufactured in the United States. The Hearing Officer found this to be especially true where McCrossin and UBI provided the ST-3 form which affirmed the UBI blowers complied with the requirements of the Steel Act and that the cost breakdown of same reflected 75% domestic and 25% foreign content. Having determined that the blower assemblies and blowers were steel products under the Steel Act, the Hearing Officer turned his attention to the question of whether same were United States steel products.

During a hearing before the Hearing Officer, UBI's owner and president, Mr. Miolee (President), testified to the way in which he identified components produced outside of the United States. As part of his determination of the total amount of foreign steel involved in Project, President applied a 10% reduction for items UBI had required from three other companies,[8] all of which provided letters to the effect that their invoices encompassed costs involved with importation, warehousing, and outbound shipping costs of the products and that 90% of the invoiced dollar amounts represented the "foreign component of the product sold, leaving at least 10% of the value of the invoice as the domestic component."[9] Hearing Officer noted that the total cost of the foreign components, after reducing the invoices by 10% of the total amount, was $59,655, and that President then compared that cost to the amount charged to McCrossin, *i.e.*, $239,800, and concluded that the foreign cost component was 24.88% of the total cost of the Project

---

[8] API Industrial, Inc., Eurus Blower, Inc., and Worldwide Electric Corp.

[9] R.R. at 0608-0610. Hearing Officer noted that the language was identical in all three letters, except that the letter from one of the companies did not contain the words "at least." R.R. at 026. The letters are also part of the record. R.R. at 0608-0610.

– even less if the $59,655 was compared to the total cost of the project, *i.e.*, $243,505, the Authority paid to McCrossin. R.R. at 026-027.

The Hearing Officer noted it was crucial to determine whether it was appropriate to reduce the invoice by 10% when attempting to discern the numerator of the fraction to use in calculating the percentage cost of foreign components in the Project. The Hearing Officer also acknowledged it was important to determine what the denominator of the fraction should be, *i.e.*, the amount that McCrossin paid to UBI or the amount that the Authority paid to McCrossin for the blower assemblies and blowers. The Hearing Officer found that the Authority was invoiced $243,505 by McCrossin, and if that number was used as the total cost, then the calculation from UBI would show the cost of the foreign components to be 24.49% of the total. However, the Hearing Officer stated he believed the appropriate foreign cost figure to be $67,340,[10] in part because he did not believe it was appropriate to allow the 10% deduction that President had applied for products from UBI's suppliers. Hearing Officer determined that UBI's suppliers sold foreign components to UBI, and that their invoices to UBI represented the "cost of the articles," per the terms of the Steel Act. R.R. at 026, Adjudication at 11. Hearing Officer opined that the costs of importing, storing, and shipping the foreign components should not be deducted from the invoice amount, especially where, as here, the invoices did not break out those components. He believed this interpretation to be consistent with the language of the Steel Act and its requirement to be liberally construed to protect the use of

---

[10] This is a total amount reflected in President's handwritten notes on Exhibit UBI-7. However, this same document also reflects a revised foreign steel total of $59,655 which was President's revised calculation of the steel components in the Project, in addition to a reduction of 10%, per the letters he had received from UBI's suppliers, *i.e.*, API, Eurus, and Worldwide Electric. R.R. at 0354.

domestic steel. Hearing Officer also determined it was most appropriate to view the total cost of the steel product as the cost to McCrossin, rather than the cost to the Authority. He opined that to determine otherwise would allow a contractor to manipulate the 75%/25% domestic/foreign split in the cost of the steel product by simply marking up the cost. The Hearing Officer further opined that, in order to comply with the requirements of the Steel Act, the cost to the contractor is the appropriate measuring stick, not the price that the contractor charges the customer, and using this method, the cost of the foreign components for the blower assemblies and blowers, in this case, was $67,340/$239,800, or 28% of the total. The Hearing Officer added that, if the denominator was changed to reflect the cost charged to the Authority, the result would still be steel products that were 27.7% foreign. Accordingly, he concluded that the blower assemblies and blowers were not United States steel products, per the Steel Act.

The Hearing Officer acknowledged that McCrossin and UBI had argued that the blowers that were part of the change order were provided free of charge and, thus, should not be included in the calculation. The Hearing Officer acknowledged that the change order retained the same price for the eight assemblies *and* three blowers as it had for the eight blower assemblies, but he did not believe this justified considering the three blowers as a gift. The Hearing Officer determined that there was no way to know if the change order would have resulted in a lower price if the only change had been from eight Dresser Roots blower assemblies to eight UBI blower assemblies.

11

The Hearing Officer did not make any findings about the appropriate remedy in the matter as the parties agreed he should not do so. Accordingly, the Hearing Officer made the following conclusions of law:

1. The blower assemblies and blowers are "steel products" as defined by the [Steel] Act.

2. The blower assemblies and blowers were not exempted from the [Steel] Act, as the Authority made no finding that blower assemblies and blowers are not produced in the United States in sufficient quantities to meet the requirement of the contract.

3. The blower assemblies and blowers cannot be considered to have been wholly manufactured in the United States.

4. The blower assemblies contain both foreign and United States steel.

5. The blowers inserted into the pre[]existing assemblies at the Authority's plant . . . contain solely foreign steel.

6. The eight blower assemblies and three blowers were treated by the parties as a unit, even though each assembly and each blower could be considered a steel product.

7. Less than 75% of the cost of the steel in the blower assemblies and blowers, when considered as a unit, represent steel that has been mined, produced, or manufactured in the United States.

8. The blower assemblies and blowers, when considered as a unit, are not "United States steel products" as defined by the Act.

R.R. at 029.

On May 21, 2018, the Trial Court remanded the matter to the Authority and the Hearing Officer for a determination of a remedy. R.R. at 0867. On August 21, 2018, the Hearing Officer presided over a hearing at which additional evidence

12

was taken regarding an appropriate remedy. R.R. at 0919. On January 17, 2019, the Hearing Officer issued a subsequent adjudication as to the remedy, and on February 6, 2019, the Authority adopted the Hearing Officer's adjudication, determining McCrossin and UBI had violated the Steel Act and, thus, should be required to refund to the Authority the total amount of $243,505 paid to McCrossin for Project. R.R. 0920; 0948. The Hearing Officer determined that "the [Steel] Act draws a clear line – a steel product is a United States steel product or it is not." R.R. at 0946. Thus, he believed he could not fashion a remedy based on the percentage of the product that failed to meet the 75% domestic steel requirement of the Steel Act. However, the Hearing Officer also determined that McCrossin and/or UBI did not fail to act in good faith or that their violation of the Steel Act was willful. R.R. at 0946-0948. McCrossin and UBI appealed the Authority's determination to the Trial Court.

## V. Trial Court Order

After argument,[11] the Trial Court issued an order on July 31, 2019, reversing the Authority's Adjudication. *See* Trial Court Order (Tr. Ct. Order) dated 7/31/19. The Trial Court determined that the Hearing Officer and the Authority did not properly calculate the United States-based content of the equipment under review because the Hearing Officer did not account for the fact the Authority received three blowers *gratis* and, thus, those blowers should have been excluded from the overall foreign content calculation. The Trial Court noted that, with the three blowers excluded from the calculations, the foreign content of the blower

---

[11] The Trial Court's order states only that argument was held. There is no indication that the Trial Court requested or accepted any evidence beyond that which had already been admitted during the proceedings before the Hearing Officer/Authority.

13

systems purchased by the Authority would fall to a level less than 25% and would bring McCrossin and UBI within the range of Steel Act compliance. In addition, the Trial Court determined that the Hearing Officer should have taken into account evidence of UBI's vendors' "markups," and if this 10% of the total cost had been considered, the percentage of foreign content would have been lower than 25%. Tr. Ct. Order at 2. In addition, Trial Court determined that, "while UBI's entire blower system may not fall within the definition of 'electrical machinery,' the electric motors which power the blower systems would." Tr. Ct. Order at 5. Trial Court noted that, because Authority initially examined UBI's blower systems component-by-component to ascertain the origin of each, potential exclusions from the Steel Act should have been considered in the same manner, and all electric motors should have been omitted from the foreign cost calculations. Tr. Ct. Order at 5.

The Trial Court disagreed with the determination that the change order to provide for three more blowers at no additional charge did not equate to a written determination that there were not enough such blowers manufactured in the United States. The Trial Court added that the Authority delegated the power of determination in this regard to its project engineer, Brinjac, which had the option of exploring other manufacturers of blower systems until the change order came into effect, and McCrossin did not have the authority to deviate from the change order after Brinjac signed it. The Trial Court added that McCrossin submitted its final payment application in April 2013, Brinjac signed same, and the Authority approved it on April 30, 2013, even though the Authority had concerns about compliance with the Steel Act.

14

In regard to the remedy, the Trial Court did not agree that same would be a complete forfeiture by the violating parties. Instead, the Trial Court opined that the remedy should be proportionate to the degree of the Steel Act violation. The Trial Court further determined that the doctrine of election of remedies was not curtailed by the Steel Act, so the Authority was not permitted to retain the equipment in question and also receive a full refund from McCrossin and/or UBI. The Trial Court stated that "[t]he Court in the *Department of Environmental Resources v. Leechburg Mining Co.*, 305 A.2d 764, 768 (Pa. Cmwlth. 1973)[,] held that the election of remedies doctrine applies to judicial remedies as well as administrative remedies." Tr. Ct. Order at 6.

Accordingly, the Trial Court reversed the adjudication, stating: "[g]iven the above review, the *de minimis* nature of [McCrossin's and UBI's] violation of the Steel Act,[12] and McCrossin's and UBI's readiness to replace the foreign steel components with components made of U.S. steel, [the Trial Court] REVERSES [the Authority's] decision." *Id*. The Authority now appeals.[13]

---

[12] We note here that the Trial Court makes a one-time reference to the **"*de minimis* nature of [McCrossin's and UBI's] violation of the Steel Act . . . ."** Tr. Ct. Order at 6 (emphasis added). However, the Trial Court's order did not find any such violation of the Steel Act. Thus, we interpret this reference to mean that, *had there been a violation* of the Steel Act, the Trial Court did not consider it to rise to a level that would have justified a full refund of the amount the Authority paid to McCrossin but that any such violation may have more reasonably justified a penalty proportionate to the amount of foreign steel in excess of the 25% limitation of the Steel Act.

[13] Because this was an appeal from an adjudication of a local agency, which produced a full and complete record of the proceedings before it, the standard of review in the appeal is limited, as set forth in Section 754(b) of Local Agency Law:

15

## VI. Authority's Appeal

On appeal, the Authority argues that the Trial Court erred by exceeding the standard of review provided by the Local Agency Law, 2 Pa. C.S. § 754(b), by finding McCrossin and UBI had not violated the Steel Act, and by refusing to affirm the Hearing Officer's/Authority's imposition of the remedy specifically provided in the Steel Act.

The Authority argues that nowhere in its opinion did the Trial Court find any of the Hearing Officer's findings of fact were not supported by substantial

> In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa. C.S. §706 (relating to disposition of appeals).

2 Pa. C.S. §754(b).

The Trial Court may only reverse where it determines that "constitutional rights were violated, an error of law was committed, the procedure before the agency was contrary to statute, or the necessary findings of fact were not supported by substantial evidence." *Sparacino v. Zoning Bd. of Adjustment, City of Phila.*, 728 A.2d 445, 447 (Pa. Cmwlth. 1999). The substantial evidence required to support the finding of an administrative agency is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. *Civil Serv. Comm'n v. Poles*, 573 A.2d 1169 (Pa. Cmwlth. 1990).

For questions of law, the scope of review is plenary and the standard of review is *de novo*. *In Re Nomination Papers of James*, 944 A.2d 69 (Pa. 2008).

evidence, that the process was contrary to the Local Agency Law, or that any constitutional rights were violated. The Authority asserts that, instead, the Trial Court re-weighed the evidence, came to alternative legal conclusions, and reversed the Hearing Officer's determination. Authority's Br. at 17-18. The Authority further asserts that the Hearing Officer's conclusions were consistent with the Steel Act's requirement that it be liberally construed to protect the use of domestic steel and that the Hearing Officer appropriately used the cost to the contractor and the amount paid to the foreign manufacturer(s) as the measuring stick, rather than the price McCrossin charged the Authority. Using this method, the cost of the foreign components for the blower assemblies and blowers was $67,340 divided by $239,800, or 28% of the total. The Authority contends the Hearing Officer appropriately concluded that the blower assemblies and blowers were not United States steel products because less than 75% of their steel cost was of domestic origin. The Authority contends the Trial Court substituted its judgment for the judgment of the Hearing Officer, who was present for the testimony of the witnesses and physically inspected the blowers, and that this was a violation of the standard of review, constituting reversible error. Authority's Br. at 23.

The Authority contends that none of the blowers in the Project were provided *gratis*, UBI paid $67,340 for the foreign steel components of the blower system purchased by the Authority, and McCrossin paid $239,800 to UBI for the system. The Authority adds that the three additional blowers were included as part of the $239,800 invoice to McCrossin, and the blowers were not free or exempt from the Steel Act simply because McCrossin issued a no-increase change order to induce the Authority to accept UBI blowers instead of the originally specified Dresser Roots

17

blowers. R.R. at 94. The Authority posits that the Hearing Officer correctly rejected the claim that any blowers were free or should otherwise be excluded from the total cost calculation. The Authority argues the purpose of the change order was ease of maintenance, as the Authority believed ongoing maintenance would be more efficient if all digestive blowers in the facility were from the same manufacturer. The Authority contends that McCrossin took and kept the three existing Dresser Roots blowers as part of the exchange and that the change order was to benefit McCrossin, not the Authority. R.R. at 0228-0229. The Authority contends it was willing to accept UBI equipment only if three additional blowers were retrofitted to replace three existing Dresser Roots blowers, because Dresser Roots blowers were originally specified to be used in order to be consistent with the Authority's existing infrastructure. R.R. at 0228; 0732-0733. The Authority further contends that, to find that these three blowers were exempt from compliance would frustrate the purpose of the Steel Act because it would allow a contractor to manipulate the cost associated with foreign steel components in order to meet the 75%/25% requirement of the Steel Act. The Authority states it was reversible error for the Trial Court to remove the three blowers from the calculation and that the Trial Court did not explain the calculations it performed to arrive at its determination relative to the 75/25% split. Authority's Br. at 24-26.

The Authority argues that the Trial Court erred by rejecting the Hearing Officer's determination not to include the 10% reduction in foreign steel costs, per UBI's testimony to same. The Authority contends that the Hearing Officer found that there could be no deduction because the foreign cost was appropriately fixed as the amount UBI paid for foreign steel components. R.R. at 0993. The Authority

18

asserts the Steel Act does not allow a deduction for importation, warehousing, marketing, and shipping costs by a foreign manufacturer, *i.e.*, the items identified by President, and UBI's suppliers, as the 10% domestic portion of the total cost. The Authority contends that UBI actually paid $67,340 to obtain the foreign steel products used in the $239,800 blower system it sold to McCrossin, and, when that $67,340 is divided into the invoice price to McCrossin, the result is a minimum of 28% of the total cost of the blowers attributable to foreign steel. Thus, the blowers were not, "steel products" as required by the Steel Act. Authority's Br. at 26-28.

The Authority asserts that the Trial Court found the Steel Act was not violated because the Authority agreed to the change order substituting the UBI blowers in place of the Dresser Roots blowers. The Authority contends, however, that there was no evidence that anyone at the Authority determined, in writing, that there were insufficient quantities of United States steel products to satisfy the Project upgrade contract requirements relative to the blowers. The Authority asserts that the Trial Court ignored the fact that McCrossin and UBI verified, under oath, that UBI's blowers complied with the Steel Act. It notes that the notion the change order created an exemption from the Steel Act was rejected by the Hearing Officer and, thus, should not have been disturbed by the Trial Court. The Authority further argues that McCrossin requested the change order and that the Authority's agreement to same was not a written determination that there were not enough of these blowers manufactured in the United States. R.R. at 0990-0991.

The Authority argues that the use of electricity in the equipment did not exempt the blowers from the Steel Act, and the Trial Court's determination that all

electric motors are exempt was due entirely to the parenthetical reference "(machinery, except electrical)" in the definition of steel products in the Steel Act. However, the Authority notes, under the rules of statutory construction, parenthetical cross-references are for identification purposes only, do not limit a statute's application, and in reference specifically to the Steel Act, do not create an exception for every steel product powered by electricity. The Authority maintains that all steel products are covered by the Steel Act, and the Act's reference to SIC 35 is merely for identification purposes and is not a strict limitation.

The Authority argues that, in *L.B. Foster Company v. Southeastern Pennsylvania Transportation Authority*, 705 A.2d 164 (Pa. Cmwlth. 1997), this Court held that certain parts of the definition of "steel products" are to be interpreted based on the statutory construction rule of "*noscitur a sociis* - a word or phrase is known by its associates." *Id*. at 170. In *L.B. Foster*, we explained that "[t]he definition makes clear that any products rolled, formed or shaped, etc., from United States steel constitute steel products within the meaning of the [Steel] Act" and that even if a product is not contained within one of the SICs listed, so long as it is rolled, formed, shaped, etc., from steel, it is subject to the domestic steel composition requirements. *Id*. at 169. The Authority asserts that the Hearing Officer soundly concluded that reading a blanket "electricity" exception into the Steel Act was inconsistent with the Steel Act's purpose as remedial legislation. R.R. at 0989-0990. Authority's Br. at 32-35.

The Authority next contends there are two available remedies under the Steel Act. First, any payment made that should not have been made because there

was not compliance with the Steel Act is recoverable directly by the public agency from the violator. Section 5 of the Steel Act, 73 P.S. §1885(a). And, second, the Steel Act provides that if the violation is determined to have been willful, the violator is automatically subject to a five-year ban on bidding/working on public contracts within the Commonwealth. The Authority only addresses the former remedy because it was the only remedy ordered by the Hearing Officer. To that point, the Authority argues compliance is a binary event: a product is either a "steel product" and thus compliant with the Steel Act, or it is not. There is no *mens rea* element. Authority's Br. at 43. The Authority notes that significant penalties for violations are a deterrent to future violators, and allowing a violator to cure a violation, after the fact, would have no deterrent effect. Authority's Br. at 51-52.

The Authority states that the Trial Court determined the violation of the Steel Act was *de minimis*[14] and, thus, not actionable. However, the Authority contends that to say the violation was *de minimis* is not a fair statement relative to what the Steel Act requires and that McCrossin and UBI did not prove, as the Steel Act requires, that 75% of the steel used in the blowers was made in the United States. Rather, McCrossin and UBI did the inverse and admitted that, at a minimum, 28% of the total cost of the blowers was directly attributable to a foreign steel product but did not prove 72% of the contract price was attributable to domestic steel. In addition, the Authority argues McCrossin and UBI chose to source steel products from China, fully understanding the penalties if they exceeded the 25% limit on

---

[14] As we noted above, the Trial Court did not determine that there was any violation of the Steel Act. Thus, we consider the Trial Court's reference to a violation of a "*de minimis* nature" to mean *had there been a violation* of the Steel Act, the Trial Court did not consider it to rise to a level that would have justified a refund of the full cost of the Project.

21

foreign steel. The Authority maintains that, in the present matter, the Steel Act requires forfeiture of all payments made relative to the blowers and that it does not provide for any sort of a *de minimis* exception. The Authority maintains the blowers are either steel products, as defined in the Steel Act, or they are not. Thus, the Authority argues the required remedy was/is repayment by McCrossin and/or UBI of the full contract price.

The Authority adds that the Steel Act does not provide a means for McCrossin and UBI to "cure" its violation. It maintains that the Trial Court gave credence to UBI and McCrossin's "readiness to replace the foreign steel components with components made of U.S. [s]teel" but should not have done so. Authority's Br. at 54; Tr. Ct. Order at 6. The Authority asserts that McCrossin and UBI argue that, if they violated the Steel Act, they should only be required to pay to the Authority the amount of foreign steel costs over the 25% threshold or, in the alternative, to provide substitute, United States steel blowers to cure the violation. However, the Authority contends that such remedies are in direct conflict with the provisions of the Steel Act and to allow same would remove any incentive for contractors to comply with the Steel Act because the only risk to them would be the possibility of having to come into compliance at some point in the future. The Authority maintains that the General Assembly determined how Steel Act violations are to be remedied (via repayment of funds and/or disbarment) and did not include an opportunity to cure or to provide a partial refund. Further, the Authority contends that, because a statutory remedy is provided under the Steel Act, principles of equity cannot be invoked. *DeLuca v. Buckeye Coal Co.*, 345 A.2d 637 (Pa. 1975) (where there is a statutory remedy which is mandatory and exclusive, equity is without power to act).

22

The Authority asserts that the express remedy of the Steel Act should be imposed. Authority's Br. at 56.

The Authority notes that the Trial Court found the Authority was foreclosed from seeking repayment, citing the election of remedies doctrine within *Leechburg Mining Co.*, 305 A.2d 764. However, the Authority contends that conclusion was in error. The Authority argues that, per *Leechburg*, the election of remedies doctrine only applies when multiple statutory enforcement options are available to an agency, the agency elects an option and sees it through to a final judgment, and then the agency tries to pursue a different statutory remedy for the same circumstances. The Authority maintains that such a scenario did not occur here. It contends it had but one statutory remedy available to it for a Steel Act violation, *i.e.*, recovery of the payments through a local agency adjudication, that it has continued to pursue that single remedy since 2014, and nothing in the Steel Act states the Authority must return the equipment in order to pursue a violation. Thus, the Authority asserts that applying the election of remedies doctrine would result in it being penalized for maintaining the status quo while the case is being litigated. Authority's Br. at 52-57.

## VII. Analysis

Upon review, we must first address the threshold question of whether the Trial Court exceeded its authority when it reversed the adjudication in this matter.

23

We acknowledge that the law requires reasonable deference to the local agency's decision and that the Trial Court may only reverse where it determines constitutional rights were violated, an error of law was committed, the procedure before the agency was contrary to statute, or the necessary findings of fact were not supported by substantial evidence. *Sparacino,* 728 A.2d 445. However, in the matter *sub judice*, the Trial Court did not reject the Hearing Officer's credibility determinations or assignment of weight to the evidence of record. It rejected the adjudication on the basis that the determinations made therein were errors in the interpretation and application of the Steel Act. Accordingly, Trial Court's order was within its authority per the Local Agency Law at 2 Pa. C.S. § 754(b) and *Sparacino*.

Having determined that the Trial Court's order is in conformance with the applicable law, we next address whether the blower systems and blowers provided to the Authority by McCrossin and UBI are steel products, per the Steel Act. To this query, we respond in the affirmative.

Although McCrossin and UBI suggest that the presence of electrical equipment in the components and systems sold to the Authority remove the Project from the requirements of the Steel Act, we disagree. It is true that the Steel Act's definition of steel products "shall include machinery and equipment listed in United States Department of Commerce Standard Industrial Classification 25 (furniture and fixture), 35 (machinery, **except electrical**) and . . . made of, fabricated from, or containing steel components." Section 6 of the Steel Act, 73 P.S. §1886 (emphasis added). However, we agree with the Authority's and the Hearing Officer's position that these were general descriptors and are representative of classifications in use in

24

1978 when the Steel Act was first signed into law. Once McCrossin and UBI decided to participate in the provision of equipment/products in a public project, and signed the ST-3 form verifying compliance with the requirements of the Steel Act, they waived their right to later challenge the application of the Steel Act on the grounds it did not apply to Project.

McCrossin argues that there was no waiver because it, and presumably UBI as well, had no *intention* of waiving any right to challenge this aspect of the Steel Act. McCrossin's Br. at 15-16. However, this argument is unpersuasive in light of the representations both made, on the ST-3 form, as part of securing their roles as contractors on the Project. Based on our determination that the blowers and blower systems are steel products as defined in the Steel Act, we turn our attention to whether same are a United States steel product with "at least 75% of the cost of the articles, materials and supplies hav[ing] been mined, produced or manufactured, as the case may be, in the United States." 73 P.S. §1886.

Critical to determining the respective amounts of foreign and domestic steel in Project are the representations from UBI's suppliers, and the testimony of President, that 10% of the total costs are, in fact, attributable to a domestic component. In these regards, the Hearing Officer stated in his findings and conclusions that he relied "almost exclusively" on President's testimony about the composition of the steel. R.R. at 028; Adjudication at 13. Further, the Hearing Officer did not determine there was a willful violation of the Steel Act by either McCrossin or UBI, even if he did not agree with the method relied upon to determine the amount of foreign steel versus domestic steel utilized in the Project.

25

In conducting our analysis of the Hearing Officer's calculation, as opposed to the method of calculation utilized by the Trial Court, we find it necessary to examine the meaning of the term "cost" in the definition of steel products. Again, we note that Section 6 of the Steel Act states that "[i]f a product contains both foreign and United States steel, such product shall be determined to be a United States steel product only if at least 75% of the "cost" of the articles, materials and supplies have been mined, produced or manufactured, as the case may be, in the United States." 73 P.S. §1886. The term "cost" was not included in the original version of the Steel Act, and, in fact, was not added until the Steel Act was amended in 1984.[15] No definition of "cost" is provided in the statute, but *Merriam-Webster Dictionary* defines "cost" as: "the amount or equivalent paid or charged for something" or "the outlay or expenditure . . . made to achieve an object."[16] Although there is a dearth of guidance on the interpretation of the word "cost" in the context of the Steel Act's definition of steel products, we view "cost," in light of its definition, to include a wide array of factors to be considered when assigning value to a product or service. Accordingly, it does not seem unreasonable to us that the Trial Court interpreted the Steel Act differently than the Hearing Officer when calculating the percentage of foreign steel in UBI's product.

The Hearing Officer acknowledged the total amount UBI paid its suppliers, API, Eurus, and Worldwide Electric Corporation, without regard to the

---

[15] *See* The Act of July 9, 1984, P.L. 674, No. 144.

[16] https://www.merriam-webster.com/dictionary/cost (last visited on July 10, 2020).

portion of the cost attributable to domestic aspects of that total associated with importing, storage, and shipping. The Hearing Officer asserted that his determination of the foreign aspects of the project reflected the "cost of the articles," per the terms of the Steel Act. Authority's Br. at 22-23; R.R. at 0026, Adjudication at 11. He did not discredit President's assertion that 10% of the invoice(s) from UBI's suppliers was for domestic costs in the total(s). Rather, he took exception to applying a 10% reduction to the total cost of the equipment because the costs of importing, storage, and shipping were not specifically identified within President's breakdown of costs, and he did not believe such costs should be included in the "cost of the articles," as the term appears in the Steel Act. The Trial Court applied the law differently to give effect to all aspects involved in the cost of the articles, thus recognizing a portion of same was attributable to value added domestically. The Trial Court determined that shipping and other costs should be included in the total "cost" of the articles, and if domestic in nature, should not be counted against UBI. This is consistent with the definition of the term "cost," which broadly includes all of the outlay/expenditure involved in achieving a final product. Further, since the Hearing Officer did not find that President was not credible as to his calculations, including the 10% domestic component of the cost of the items from his suppliers, the Trial Court's reversal of the Hearing Officer in this regard was not unreasonable or outside of its discretion – especially where the Steel Act's lack of guidance leaves it open to such interpretation.

Given the Steel Act's focus on determining specific percentages of steel involved in a final product, and the reference to the cost of the project to the public entity, we must arrive at both a numerator and denominator - as both the Hearing

27

Officer/Authority and the Trial Court did. In this regard, and in accordance with our opinion herein, we see no error by the Trial Court when it used $59,655 as the numerator of the equation in determining the foreign component of the steel product provided by UBI. As for the denominator of the equation, the Steel Act unquestionably puts its focus on the public agency's payment to the contractor. In the present matter, that would implicate the $243,505 paid to McCrossin by the Authority. However, here, it is not clear to us which total amount UBI was considering when it signed the ST-3 form, *i.e.*, the $239,800 it was paid by McCrossin or the $243,505 McCrossin was to be paid (and ultimately was) by Authority. R.R. at 0597, ST-3 Form. Regardless, both calculations result in a foreign component under 25% ($59,655 divided by $243,505 results in a percentage of 24.5%, whereas $59,655 divided by $239,800 results in a percentage of 24.9%). Thus, there was no violation of the Steel Act. Accordingly, we need go no further in our review of the Trial Court's order, and the matter of a "remedy" does not need to be decided.[17]

---

[17] Although we do not reach the issue of remedy in this matter, we note that the Trial Court did not err when it determined the Authority was not entitled to receive a full refund while, at the same time, keeping the blower systems and blowers provided by McCrossin. In this regard, we acknowledge that McCrossin makes a compelling argument that equity abhors a forfeiture. Further, we believe that allowing the Authority to keep the blower systems and blowers while also receiving a full refund from McCrossin and/or UBI would result in unjust enrichment of the Authority. Further, Section 5(a) of the Steel Act states, in pertinent part: "[a]ny such payments made to any person by any public agency which should not have been made as a result of this section shall be recoverable . . . ." 73 P.S. §1885(a). It does not state that the entirety of the cost of a project is recoverable. In fact, it, at least arguably, suggests that only the portion of the payments made for steel products that were *not* compliant with the Steel Act are recoverable. For the portion that was compliant, there would be nothing to "recover."

Per the foregoing, we affirm the Trial Court's order reversing the adjudication of the Hearing Officer as adopted by the Authority.

_____
J. ANDREW CROMPTON, Judge


Judge Fizzano Cannon did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| United Blower, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| Lycoming County Water and | : | No. 1383 C.D. 2019 |
| Sewer Authority | : | |
| | : | |
| G.M. McCrossin, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| Lycoming County Water and | : | |
| Sewer Authority | : | |
| | : | |
| Appeal of: Lycoming County | : | |
| Water and Sewer Authority | : | |

## **O R D E R**

     **AND NOW**, this 13th day of July 2020, the Order of the Lycoming County Court of Common Pleas is **AFFIRMED**.

 

 

_____

J. ANDREW CROMPTON, Judge